## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**KEITH N. MCKNIGHT,**

        **Plaintiff,**

v.                              **Case No: 6:22-cv-622-PGB-RMN**

**UNITED PARCEL SERVICE,
INC.,**

        **Defendant.**
_____/

## ORDER

This cause comes before the Court on Defendant's Motion for Summary Judgment, filed July 17, 2023. (Doc. 25 (the "**Motion**")). Plaintiff responded in opposition (Doc. 37 (the "**Response**")), and Defendant replied thereto (Doc. 40 (the "**Reply**")). Upon consideration and review of the record, Defendant's Motion for Summary Judgment is granted in part and denied in part.

## I.    BACKGROUND

Plaintiff Keith McKnight ("**Plaintiff**") brings this action against Defendant United Parcel Service, Inc. ("**Defendant**" or "**UPS**"). Plaintiff alleges that he suffered race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("**Title VII**"), the Florida Civil Rights Act ("**FCRA**"), and 42 U.S.C. § 1981. (Doc. 1).

Plaintiff, an African American, began his employment with Defendant on September 15, 2016, as a preloader in the UPS Kissimmee Center. (Doc. 23, ¶ 12;

Doc. 37, p. 2). In October 2017, Plaintiff was promoted to package car driver ("**driver**"). (Doc. 23, ¶ 12). At the UPS Kissimmee Center, Plaintiff reported to the Center Manager, Nicole Strickland ("**Strickland**"), who reported to Package Division Manager, Michael Alberni ("**Alberni**"). (*Id.* ¶¶ 13, 15).

UPS' frontline operations employees, including drivers, "are members of a nationwide Collective Bargaining Agreement [("**CBA**")] represented by Teamsters, a labor union [("**Union**")]." (*Id.* ¶¶ 3–5). Pursuant to the CBA, Union members may use a grievance-arbitration process to resolve "any controversy, complaint, misunderstanding or dispute arising as to interpretation, application or observance of any of the provisions of [the CBA.]." (*Id.* ¶ 5). If a grievance cannot be resolved at the center level, it is progressed to a local level meeting with the shop steward, grievant, Strickland, UPS Labor Manager Roy French ("**French**"), and the Teamsters' Business Agent Dave Concannon ("**Concannon**"). (Doc. 24-1, ¶ 15).

Beginning in December 2020, Plaintiff "began filing grievances alleging Strickland, Alberni, and the Kissimmee Center management team was bullying, intimidating, harassing, discriminating, and retaliating against him due to his race." (Doc. 23, ¶ 16). Namely, in his first grievance on December 7, 2020, Plaintiff alleged that his managers constantly harassed him and threatened him with termination. (Doc. 23-3, p. 4). As a remedy, Plaintiff requested "[t]o be provided with a professional work environment where [he] can be proud to show up to work as a minority." (*Id.*).

2

Thereafter, Plaintiff alleged that Defendant responded to such grievances with retaliatory conduct. (Doc. 23, ¶ 17). Plaintiff claimed he experienced: unsafe conditions with his vehicle, increased scrutiny or observations, incorrect packages deliberately loaded on his vehicle, hostile and degrading conduct, disparate treatment, unwarranted discipline, and so forth. (Doc. 37, pp. 2–11). Plaintiff continued filing his grievances, which totaled to 2,100 grievances spanning from December 2020 to June 2022. (Doc. 23, ¶ 10; Docs. 23-3 to 23-20).

Around February 2021, Plaintiff engaged in behavior that caused Defendant concern over Plaintiff's mental state. (Doc. 25, pp. 3–4). For example, Plaintiff used the term "with extreme prejudice"[1] on his grievances and called the UPS EthicsPoint Hotline to report that "Alberni has to kill him," that one of his guns was "stolen from his home," and that he was going to be "executed with his own weapon." (Doc. 23, ¶¶ 19–20).

In response, Defendant requested Plaintiff to undergo a fitness for duty ("**FFD**") evaluation in February 2021. (*Id*. ¶ 22). Plaintiff was off from work from February 2021 to March 2021 pending the FFD evaluation. (*Id*. ¶¶ 22–24). Upon completion of the FFD evaluation, the evaluator, David Congdon, informed Defendant that Plaintiff was deemed fit to perform services as a driver. (*Id*. ¶ 23). Thus, on March 8, 2021, Plaintiff returned to work. (*Id*.).

---

[1]   (*See* Doc. 23, ¶ 19 ("When using the phrase 'with extreme prejudice,' in his grievances, McKnight, as former U.S. Military, understood that phrase meant to cause harm without first questioning the order.")).

Nonetheless, Plaintiff's behavior continued to concern Defendant over Plaintiff's mental state. (Doc. 25, pp. 4–6). Specifically, between May 2021 and June 2021, Plaintiff wrote the word "sabotage" on several packages loaded on his truck for delivery to customers. (Doc. 23, ¶ 25). Further, other employees reported concerns regarding Plaintiff's behaviors. (Doc. 25, p. 5). One employee called the UPS Hotline to report Plaintiff's "inappropriate and unprofessional behavior towards the caller and other employees, including management." (Doc. 24-5, p. 2). Finally, on June 15, 2021, at a grievance panel hearing, Plaintiff arrived wearing a bulletproof vest, with "black lives matter except at UPS" written across it, and carrying a military style rucksack. (Doc. 23, ¶ 26; Doc. 25, p. 5). The next day, Defendant instructed Plaintiff not to report to work as Defendant intended to seek another FFD evaluation. (Doc. 23, ¶ 28).

On June 29, 2021, Dr. David Maroof ("**Dr. Maroof**") conducted Plaintiff's second FFD evaluation ("**FFD Evaluation**").[2] (*Id.* ¶ 29). On June 30, 2021, in the FFD Report, Dr. Maroof opined that Plaintiff "was not fit to perform the essential functions of his job." (*Id.* ¶ 30; Doc. 23-22). Defendant did not share the FFD Report with Plaintiff until February 2022, even though he previously requested such information. (Doc. 34-5, pp. 22, 27).

Following the FFD Evaluation, UPS' Employee Assistance Program Provider, Aetna, scheduled Plaintiff's appointment through Lifestance, a medical

---

[2] The Court notes that Plaintiff underwent an FFD evaluation in February 2021 and June 2021. (Doc. 23, ¶¶ 22, 29). However, the Court hereinafter solely refers to the June 2021 evaluation when discussing the "FFD Evaluation."

provider program, for November 8, 2021, with provider Tysam Beckett. (Doc. 24-3, ¶¶ 5, 20). Tysam Beckett recommended medicine, psychotherapy, and additional testing for Plaintiff's treatment. (Doc. 23, ¶ 33).

In December 2021, six (6) months after the FFD Evaluation, Strickland and French learned for the first time that Plaintiff was deemed not fit for duty in June 2021. (Doc. 24-3, ¶ 24). From the FFD Evaluation to January 7, 2022, Plaintiff received his regular salary and benefits while he was off duty from work. (Doc. 23, ¶ 34). However, the CBA only permits employees who are deemed not medically fit for duty "to keep their jobs and be placed on unpaid leave." (*Id.* ¶ 38). While on unpaid leave, an employee can apply for short term disability ("**STD**") benefits "to ensure continuation of pay and health insurance benefits." (*Id.*).

Accordingly, to comply with the CBA, on January 7, 2022, Strickland, French, and Concannon informed Plaintiff that his pay would be discontinued, and that he should apply for STD benefits. (*Id.* ¶ 35; Doc. 24-2, ¶ 42). In response, Plaintiff—who was not privy to the FFD Report at this time—stated he was not disabled and refused to apply for STD benefits. (Doc. 24-2, ¶ 43). Thus, Defendant terminated Plaintiff's medical benefits on that same day and discontinued his pay two weeks later. (Doc. 23, ¶ 35; Doc. 34-5, pp. 24–25). Nonetheless, French again informed Plaintiff that he needed to apply for STD benefits. (Doc. 23, ¶ 37). Again, considering Defendant had yet to disclose the FFD Report, Plaintiff did not believe he was disabled. (Doc. 34-5, pp. 24–25). Consequently, he never filed for STD. (Doc. 23, ¶ 39).

On January 21, 2022, Plaintiff met with Dr. Jose Ruiz ("**Dr. Ruiz**"), a LifeStance Medical Director. (Doc. 23-23). Plaintiff reported that he did "not feel he [was] suffering from any psychiatric conditions." (*Id.*). As such, Dr. Ruiz informed Plaintiff that if Plaintiff "feels he does not need any care then [LifeStance] will not recommend any further care." (*Id.*). Plaintiff was discharged from LifeStance's treatment three (3) days later. (Doc. 23, ¶ 42).

A few weeks later, on February 3, 2022, Concannon sent Plaintiff an e-mail to address his noncompliant status. (Doc. 23-24, p. 3). Concannon directed Plaintiff to contact Patti Farrar ("**Farrar**"), the Aetna Case Manager, so she could help Plaintiff become compliant. (*Id.*; Doc. 23, ¶ 43). Concannon further informed Plaintiff that if he did not contact Farrar, Defendant would possibly terminate his employment. (Doc. 23-24, p. 3). In response, on February 6, 2022, Plaintiff explained that he complied with other coordinators, and that he had not properly begun the coordinator process with Farrar. (*Id.* at pp. 2–3). The next day, Concannon again informed Plaintiff of the urgency to contact Farrar to prevent Plaintiff's termination. (*Id.* at p. 2).

Finally, on February 9, 2022, Plaintiff told Farrar that he would agree to participate in the recommended treatment plan. (Doc. 24-3, ¶ 28). Farrar sent Plaintiff a list of providers and instructed him to file for STD benefits. (Doc. 23-24, pp. 5–7). On February 21, 2022, Farrar reported that she attempted to contact Plaintiff, but he never responded. (Doc. 24-3, ¶ 30). Consequently, on February 23, 2022, Defendant sent Plaintiff a 48-Hour Termination Notice, allowing Plaintiff a

final chance to contact Farrar to comply with treatment. (Doc. 23-25). That same day, Plaintiff called Farrar to explain that he had no insurance or income to pay for treatment. (Doc. 34-5, p. 31). Farrar then directed Plaintiff to contact Jill Cutaiar ("**Cutaiar**"), UPS' Occupational Health Manager. (*Id.*). Plaintiff emailed Cutaiar on February 25 and February 28, 2022, but she did not respond. (*Id.*; Doc. 34-6, pp. 2–3).

On March 10, 2022, Strickland sent a second 48-Hour Termination Notice. (Doc. 23-26). Therein, Strickland directed Plaintiff to update Farrar within forty-eight (48) hours on his compliance with treatment. (*Id.*). Strickland warned Plaintiff that failure to comply would result in termination of his employment. (*Id.*). Plaintiff called Farrar, left her a message, emailed her, and called her again over the next two (2) days, but she never responded. (Doc. 34-5, p. 34; Doc. 34-6, p. 2).

Ultimately, French determined that due to Plaintiff's noncompliance with treatment, he was on an unauthorized leave of absence. (Doc. 24-2, ¶ 56). As a result, on March 17, 2022, Strickland sent Plaintiff a discharge letter terminating his employment. (Doc. 23, ¶ 50).

On March 22, 2022, Plaintiff timely grieved his termination. (*Id.* ¶ 51). After a Southern Region Area Parcel Grievance Committee Hearing, Plaintiff's grievance was denied, and his termination was upheld. (*Id.*). On May 24, 2022, the Union, on Plaintiff's behalf, settled all of Plaintiff's open grievances, excluding four grievances about pay, "which are not at issue in this litigation." (*Id.* ¶ 52). Pursuant

to the settlement, Defendant was to pay Plaintiff $ 1,687.50. (*Id.*). On June 11, 2022, Defendant issued the monies owed via check, which Plaintiff accepted and deposited. (*Id.* ¶ 53).

The aforementioned matters culminated in Plaintiff filing the instant action on March 29, 2022. (Doc. 1). Ultimately, on July 17, 2023, Defendant filed a Motion for Summary Judgment. (Doc. 25). Then, on September 11, 2023, Plaintiff filed his Amended Response Opposing Defendant's Motion for Summary Judgment (Doc. 37), and Defendant replied thereto. (Doc. 40). The matter is now ripe for review.

## II.   STANDARD OF REVIEW

To prevail on a summary judgment motion, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014).

Importantly, the Court must "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant." *Davila v. Gladden*, 777 F.3d 1198, 1203 (11th Cir. 2015) (citation omitted). At the same time, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice;

there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1162 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)). Ultimately, summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.   DISCUSSION

To begin, the Court addresses Defendant's arguments regarding settlement and preemption. Next, the Court addresses Plaintiff's race discrimination and retaliation claims pursuant to Title VII, the FCRA, and § 1981. (Doc. 1).

### A.   Settlement and Preemption

In its Motion, Defendant discusses a potential lack of case or controversy due to Plaintiff's settlement of grievances, or alternatively, preemption of Plaintiff's claims due to Section 301 of the Labor Management Relations Act ("**Section 301**"). (Doc. 25, pp. 10–15). For the reasons set forth below, the Court rejects such arguments.

First, Defendant asserts that "no justiciable controversy is presented" because Plaintiff settled "all open grievances." (*Id.* at p. 10). Plaintiff contends that Plaintiff's settlement of grievances does not preclude the present claims because the "grievance process remedies are limited in comparison" to the remedies sought in this lawsuit (Doc. 37, p. 12). To support this, Plaintiff relies on *Strozier v. General Motors Corp.*, 635 F.2d 424 (5th Cir. 1981), in which the court found that

a prior settlement foreclosed a subsequent lawsuit where "[t]he remedy sought and settled was the *precise remedy* sought in [the] lawsuit." (*Id.* (citing *Strozier*, 635 F.2d at 426 (emphasis added))).[3] The Court agrees with Plaintiff's position. Notably, the binding caselaw that Defendant relies on discusses the relevance of similar remedies for a claim to be considered resolved.[4] Here, the remedies sought in Plaintiff's settlement of the grievances are *different* from the remedies sought in this lawsuit. (Doc. 37, pp. 12–13; Doc. 1; Doc. 23-28). Thus, the claims presented are not resolved, and a justiciable controversy is present.

As to preemption, Defendant explains: (1) the two circumstances in which an employee can sue to enforce a CBA, and (2) if an employee sues for breach of a CBA, Section 301 preempts such a claim. (Doc. 25, p. 12). Here, Plaintiff is suing for discrimination and retaliation under various federal and state laws. (Doc. 1). Plaintiff is not suing to enforce a CBA, or for breach of a CBA. (*Id.*; Doc. 37, p. 13). Consequently, the Court declines analysis of the CBA and Section 301 as neither is relevant here.

---

[3]   The Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

[4]   (*See* Doc. 25, pp. 10–11); *Flast v. Cohen*, 392 U.S. 83, 95 (1968) ("[N]o justiciable controversy is presented when the question sought to be adjudicated has been mooted by subsequent developments . . . ." (citing *California v. San Pablo & T.R. Co.*, 149 U.S. 308, 314 (1893) (holding that there was no cause of action because the plaintiff had obtained everything that it *could* recover))); *Strozier*, 635 F.2d at 426 (holding that plaintiff's settlement foreclosed the lawsuit because the "remedy sought and settled was the precise remedy sought" in the lawsuit); *Scherer v. Davis*, 543 F. Supp. 4, 12 (N.D. Fla. 1981) (finding that because Plaintiff had "specifically pled for additional specialized relief in this action[,] which could not have been afforded in the Career Service Commission proceeding," plaintiff had not waived his claims for damages not afforded in the proceeding).

Since Defendant's arguments regarding settlement and preemption fail, the Court continues its analysis on the merits of the claims.

### B.   Counts I, II, and V: Race Discrimination

A plaintiff may establish a claim of race discrimination under Title VII, the FCRA, and § 1981 (collectively, the "**Acts**")[5] through "direct evidence, circumstantial evidence, or statistical proof." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1264 (citation and internal quotation marks omitted). When a plaintiff relies on circumstantial evidence, the court evaluates such claims using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See id.*

In applying the *McDonnell Douglas* framework, the plaintiff carries the initial burden of establishing a prima facie case of discrimination by showing (1) that he belongs to a protected class, (2) that he was subjected to an adverse employment action, (3) that he was qualified to perform the job in question, and (4) that his employer treated similarly situated employees outside his class more favorably. *See Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (citing *Holifield v. Reno*, 115 F.3d 1555, 1561–62 (11th Cir. 1997)).

---

[5]   Florida courts interpret the FCRA in accord with Title VII because the FCRA is patterned after Title VII. *Hinton v. Supervision Int'l, Inc.*, 942 So. 2d 986, 989 (Fla. 5th DCA 2006) (citing *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385 (11th Cir. 1998) ("Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act.")). The same goes for claims brought under 42 U.S.C § 1981. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both of these statutes have the same requirements of proof and use the same analytical framework . . . ."), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (1973).

Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). If the employer produces evidence of a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff is afforded the opportunity to show that the employer's stated reason is a pretext for discrimination. *Id.* at 256.

### 1. *Plaintiff's Prima Facie Case of Discrimination*

Considering Plaintiff relies on circumstantial evidence to support his race discrimination claims, the *McDonnell Douglas* framework applies.[6] The parties do not dispute the first and second elements of Plaintiff's prima facie case.[7] The Court therefore tailors its analysis to the third and fourth elements of Plaintiff's prima facie case of race discrimination.

Defendant argues that Plaintiff fails to meet his prima facie burden because Plaintiff cannot identify a comparator or establish that he was qualified. (*See* Doc. 25, pp. 16–20). Plaintiff argues that Kyle Longest ("**Longest**"), a Caucasian driver for UPS, satisfies as a comparator because he "received preferential treatment when compared" to Plaintiff. (Doc. 37, p. 14). Plaintiff also argues that because

---

[6] Plaintiff concedes that his claims rely on circumstantial evidence. (*See* Doc. 37, p. 13 ("Plaintiff's race claims rely on circumstantial evidence . . . .")).

[7] Although Defendant briefly discussed the second element of a prima facie case in a footnote, the Court need not consider arguments solely discussed in footnotes. (Doc. 25, p. 17, n.18); *see SEC v. Synergy Settlement Servs., Inc.*, 2023 WL 2633332, at *5 (M.D. Fla. Mar. 24, 2023) (declining to address the defendant's argument raised exclusively in the footnote).

there was never a follow-up FFD evaluation, "Defendant had no accurate basis to assert that Plaintiff[,] who still had his CDL [Commercial Driver's License ("**CDL**")] license at the time, was unfit for duty at that point." (*Id.*).

### a.   *Prima Facie: Third Element*

Plaintiff fails to establish that "he was qualified to perform the job in question." *See Lewis*, 918 F.3d at 1220. In June 2021, after conducting the FFD Evaluation, Dr. Maroof opined that Plaintiff was not fit for duty because he had "a psychiatric condition that would preclude him from performing the essential functions of the job." (Doc. 23, ¶¶ 30–31). Defendant thereafter provided Plaintiff opportunities to remedy his condition for Plaintiff to return to work, but Plaintiff failed to comply. (*Id.* ¶¶ 32–49). Thus, because of the FFD Report and Plaintiff's failure to seek subsequent treatment, Defendant contends that Plaintiff was not qualified to perform as a UPS driver. (Doc. 25, pp. 19–20).

In his Response, Plaintiff argues that Defendant's contention fails because: (1) a follow-up FFD evaluation never occurred, and (2) Plaintiff had his CDL at the time of termination. (Doc. 37, p. 14). First, the fact that Plaintiff never underwent a follow-up FFD evaluation does not negate the fact that Plaintiff was deemed not fit for duty in the June 2021 FFD Evaluation. (Doc. 23, ¶¶ 30–31). Second, the assertion that Plaintiff had his CDL at the time of termination is irrelevant and holds no bearing on the Court's analysis, especially because the CDL was outdated at that time. (Doc. 37, p. 14; Doc. 40-1). Moreover, Plaintiff's outdated CDL, which is only one of many qualifications to perform as a UPS driver, does not contradict

the fact that Plaintiff was deemed "not fit to perform the essential functions of his job" in the FFD Evaluation. (*See* Doc. 40, pp. 6–7). Consequently, Plaintiff fails to satisfy the third element of his prima facie case for race discrimination.

### b.   *Prima Facie: Fourth Element*

Even assuming Plaintiff could satisfy the first three elements of a prima facie case, Plaintiff cannot meet the Eleventh Circuit's standard for the fourth element– that Defendant "treated 'similarly situated' employees outside his class more favorably." *See Lewis*, 918 F.3d at 1220. In *Lewis*, the Eleventh Circuit held that a plaintiff must show that he and his comparators are "similarly situated in all material respects." *Id*. at 1224. The Eleventh Circuit delineated that a "similarly situated comparator," for instance, would: be similar in the same conduct or misconduct as the plaintiff; have been subject to the same employment policy; have the same supervisor; and share the plaintiff's employment or disciplinary history. *Id.*

Here, in applying the *Lewis* standard to Plaintiff's own presentation and facts, Plaintiff and his alleged comparator, Longest, are not "similarly situated in all material respects." *Id*. at 1224, 1229. To begin, Plaintiff and Longest are not similarly situated in their conduct or misconduct. *Id*. According to Longest, he was placed on paid leave because UPS "didn't like [his] attitude and said he was grossly insubordinate, but they never issued any sort of reason." (Doc. 34-1, 6:20–7:5). Further, when asked to specify why he was disciplined, Longest stated the reasons were "[w]hatever they come up with . . . whenever they feel like it, is the best way

to describe it." (*Id.* 8:16–21).[8] Conversely, Plaintiff's undisputed conduct included: using the term "with extreme prejudice" on his grievances; calling the UPS EthicsPoint Hotline to report that "Alberni has to kill him," that one of his guns was "stolen from his home," and that he was going to be "executed with his own weapon;" writing the word "sabotage" on several packages; wearing a bulletproof vest and carrying a military style rucksack to a grievance panel hearing; failing the FFD Evaluation in June 2021; and failing to comply with Defendant's recommended treatment to return to work. (*See* Doc. 23, ¶¶ 19, 21, 25, 26, 28, 30, 31, 36–50). Plaintiff provides no further evidence or analysis as to how his conduct or misconduct compares to Longest's. (*See generally* Doc. 37).

Plaintiff also fails to show any other material respects in which Plaintiff and Longest are similarly situated under the *Lewis* standard. Although both individuals shared the same supervisors at some point in their respective employments, Plaintiff does not specify which of Longest's disciplinary measures were undertaken by which supervisors. (Doc. 34-1, 6:20–10:8, 12:20–13:8; Doc. 23, ¶¶ 13–16); *Lewis*, 918 F.3d at 1228 (citing *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) (observing that "disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis")). As to employment policies, Plaintiff fails to explain why Longest underwent any

---

[8]   The Court notes that Plaintiff fails to state any other assertions or citations to the record regarding Longest's conduct or misconduct. (*See generally* Doc. 37). Instead, Plaintiff centers the comparator analysis on the fact that Longest was disciplined—without explaining why— "at a much greater level than Plaintiff" and is still employed by UPS. (*Id.* at p. 14).

disciplinary action or what employment policy he was subject to. (*See generally* Doc. 37). Finally, as to employment or disciplinary histories, Plaintiff and Longest are not similarly situated. Longest began his employment with UPS in 2008 and began as a driver in 2014. (Doc. 34-1, 5:2–18). Plaintiff began his employment with UPS in 2016 and began as a driver in 2017. (Doc. 23, ¶ 12). Longest was disciplined over two hundred (200) times and underwent approximately one hundred (100) terminations. (Doc. 34-1, 8:12–15, 9:8–18). Although Plaintiff's disciplinary history was not provided, Plaintiff stated that "Longest has been disciplined at a much greater level than Plaintiff." (Doc. 37, p. 14). Consequently, Plaintiff fails to show that "his employer treated similarly situated employees outside his class more favorably." *See Lewis*, 918 F.3d at 1224, 1229.

Plaintiff therefore fails to meet his burden in establishing a prima facie case under the *McDonnell Douglas* framework, and thus, the burden does not shift to Defendant. As such, summary judgment is granted in favor of Defendant as to Counts I, II, and V.

### C.     Counts III, IV, and VI: Retaliation

Similarly, when retaliation claims under Title VII, the FCRA, and § 1981 are based on circumstantial evidence, the *McDonnell Douglas* burden-shifting framework applies.[9] *See Johnson v. Miami-Dade County*, 948 F.3d 1318, 1325 (11th Cir. 2020) (citation omitted).

---

[9]   Claims under the FCRA and § 1981 are analyzed using the same framework as Title VII claims. *See supra* note 5.

First, the plaintiff must establish a prima facie case of retaliation, which includes: "(1) that he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there is some causal relationship between the two events." *See id.* (quoting *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997), *abrogated on other grounds by Lewis*, 918 F.3d 1213).

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to present a "legitimate, nonretaliatory reason" for the employment decision. *See id.* A reason is legitimate "if it might motivate a reasonable employer to act." *See Berry v. Crestwood Healthcare LP*, 85 F.4th 1300, 1307–08 (11th Cir. 2023) (citation omitted). If the defendant meets this burden, the burden shifts back to the plaintiff to show that the reason is pretextual. *Id.* Specifically, to avoid summary judgment, the plaintiff "must establish a genuine dispute of material fact that the employer's reason is pretextual." *Id.* at 1308 (citing *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 921 (11th Cir. 1993)). To establish pretext, a plaintiff must present sufficient doubt on the proffered reason's "veracity that a reasonable factfinder could find it 'unworthy of credence.'" *Id.* (citation omitted). In doing so, a plaintiff must point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reason. *Id.*

### 1. *Plaintiff's Prima Facie Case of Retaliation*

First, the Court highlights that Defendant does not even discuss whether Plaintiff can establish a prima facie case of retaliation, and thus, presents no opposition. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not

properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."). Nevertheless, upon construing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has met his burden in establishing a prima facie case of retaliation.

As to the first element, Plaintiff engaged in statutorily protected expression when he filed his grievances opposing Defendant's discriminatory conduct.[10] (*See* Doc. 23, ¶¶ 10, 16–19, 24); *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1144 (11th Cir. 2020) ("The making of informal complaints or the use of internal grievance system is protected conduct under the opposition clause." (citations omitted)). Second, Plaintiff suffered two adverse employment actions— termination and disparate treatment. (*See* Doc. 37, pp. 17–18); *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008) ("[I]n the context of a Title VII retaliation claim, a materially adverse action 'means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" (citation omitted)). Third, there was a causal connection between Plaintiff's

---

[10] The Court acknowledges Plaintiff's assertion that the time between the receipt of his right to sue notice and his termination "supports a retaliation inference." (*See* Doc. 37, p. 17). Nonetheless, the Supreme Court has held that the "suggestion that the EEOC's issuance of a right-to-sue letter–an action in which the employee takes no part–is a protected activity of the employee" is "utterly implausible." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

grievances—which the relevant decisionmakers were aware of—and the adverse employment actions. (*See* Doc. 23, ¶¶ 10, 16–19, 24; Doc. 24-1, ¶¶ 15–18; Doc. 24-2, ¶¶ 20–23; Doc. 34-4, 23:24–26:4); *Kidd v. Mando Am. Corp.*, 713 F.3d 1196, 1211 ("To establish a causal connection, a plaintiff must show that the relevant decisionmaker was 'aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'" (citation omitted)).

### 2.   *Plaintiff's Evidence of Pretext*

Since Plaintiff experienced two adverse employment actions—termination and disparate treatment—the Court analyzes Defendant's reason for each below.

### a.   *Termination*

Defendant asserts that its legitimate, nonretaliatory reason for terminating Plaintiff was because Plaintiff failed to comply with the recommended treatment. (*See* Doc. 25, pp. 20–22, 24). In his Response, Plaintiff asserts that Defendant's reason is pretextual based on an array of "noteworthy facts" summarized below. (*See* Doc. 37, pp. 15–16).

In support of its legitimate, nonretaliatory reason for terminating Plaintiff, Defendant relies on the evidentiary record, to include various facts that Plaintiff has stipulated to. (*See* Doc. 25, pp. 20–22, 24; Doc. 23). Defendant presents sufficient evidence to show that because Plaintiff was noncompliant with the recommended treatment, it had a legitimate, nonretaliatory reason to terminate Plaintiff. (*Id.*). Thus, Defendant satisfies the burden of showing that its stated reason "might legitimately motivate a reasonable employer to terminate an

employee." *Berry*, 85 F.4th at 1308 (citation omitted). The burden therefore shifts to Plaintiff to show evidence of pretext.

As evidence of pretext, Plaintiff discusses the barriers imposed by Defendant that he encountered in his attempts to comply with the recommended treatment. (Doc. 37, pp. 7–10, 15–16). Specifically, Plaintiff states that Defendant: failed to notify Plaintiff that his insurance was cancelled, failed to instruct Plaintiff on how he was being noncompliant, provided Plaintiff with inaccurate and/or inconsistent information, and falsely claimed that Plaintiff cancelled appointments.[11] (*See id.* at pp. 15–16). Such facts could lead a reasonable jury to find that Defendant's proffered reason for terminating Plaintiff is "unworthy of credence." *Berry*, 85 F.4th at 1307. Specifically, a reasonable jury could find that it may not have been Plaintiff's "continued refusal to participate in treatment," but rather it was Defendant's failure to provide Plaintiff with accurate and consistent information, the FFD Evaluation, insurance coverage, and so forth that led to Plaintiff's noncompliance.[12] (Doc. 25, p. 24).

---

[11]   The Court acknowledges that in its Reply, Defendant addressed these alleged barriers: the cessation of Plaintiff's insurance, the inaccurate information during the treatment process, and the accusations of Plaintiff's noncompliance. (*See* Doc. 40, pp. 8–9). However, the Court is not convinced by Defendant's broad assertions drawn on narrow facts. For example, it may be true that Plaintiff never scheduled an appointment with a psychiatrist, although he was told to do so. (*Id.* at p. 8). It may also be true that Defendant's inconsistent and inaccurate information hindered Plaintiff from scheduling such an appointment. (Doc. 37, p. 16). Additionally, Defendant states that "Plaintiff *voluntarily* chose not to seek and/or pay for recommended treatment." (Doc. 40, p. 9 (emphasis added)). Yet, Defendant fails to consider that, viewed in the light most favorable to Plaintiff, Plaintiff may have been unable to seek and/or pay for recommended treatment because Defendant ceased Plaintiff's insurance and pay. (Doc. 23, ¶ 47).

[12]   Notably, Defendant repeatedly contends that Plaintiff "refused" treatment. (Doc. 25, pp. 7–8, 21–22). Yet, Defendant ignores the fact that it waited until February 2022—weeks before

Upon construing the facts in the light most favorable to Plaintiff, a reasonable jury could find that Defendant's conduct, or lack thereof, may have caused Plaintiff's noncompliance with treatment. Consequently, Plaintiff has presented sufficient "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" to create a genuine dispute of material fact that Defendant's proffered reason for termination—namely, Plaintiff's noncompliance—is pretextual. *Berry*, 85 F.4th at 1307–08.

### b. *Disparate Treatment*

In addition to his termination, Plaintiff "experienced a number of incidents, attitudes, and decisions" that were a "result of retaliatory animus" and amounted to disparate treatment. (Doc. 37, pp. 2–3, 16–18). In its Motion, Defendant provided legitimate, nonretaliatory reasons for its FFD evaluation request and termination decision, but not for its alleged disparate treatment of Plaintiff.[13] (Doc. 25, pp. 23–24). Consequently, Defendant does not satisfy its burden in showing a legitimate, nonretaliatory reason for its adverse action of disparate treatment.

In sum, as to Plaintiff's termination, Plaintiff satisfies his burden in showing that Defendant's reason was pretextual. As to disparate treatment, Defendant fails

---

Plaintiff's termination—to disclose the FFD Report to Plaintiff. (Doc. 34-5, pp. 22, 27). Consequently, Plaintiff went the eight (8) month process without even knowing why he was deemed not fit for duty or what "disability" he had. (*Id.*). Thus, considering Defendant failed to provide Plaintiff with accurate information on the underlying FFD Evaluation, Plaintiff's hesitations to take medications, undergo treatment, and apply for STD were warranted.

[13]   The Court highlights that Plaintiff alleged several instances of disparate treatment in the Complaint. (*See* Doc. 1, ¶¶ 14, 15, 23, 24).

to satisfy its burden in showing a legitimate, nonretaliatory reason. Thus, summary judgment is denied as to Counts III, IV, and VI.

### D.   PUNITIVE DAMAGES

Under Title VII, a plaintiff may recover punitive damages upon showing that a defendant engaged in a discriminatory practice(s) "with malice or with reckless indifference to the federally protected rights of an aggrieved individual."[14] 42 U.S.C. § 1981a (a)(1), (b). A showing of egregious misconduct is not required, but rather, "[t]he terms "malice" or "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). Simply put, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 536.

Defendant argues that Plaintiff cannot survive summary judgment because Plaintiff "has failed to present sufficient evidence to support its claim [for punitive damages] at trial." (Doc. 25, p. 25). To the contrary, Plaintiff asserts that Defendant's conduct reflects "reckless indifference and malice toward Plaintiff's rights." (Doc. 37, p. 19). Specifically, Plaintiff points to Defendant's "decision to characterize Plaintiff as mentally ill twice and force him from his employment,"

---

[14]   Claims under the FCRA and § 1981 are analyzed using the same framework as Title VII claims. *See supra* note 5.

lack of response to Plaintiff's numerous complaints of discrimination and retaliation, and retaliatory conduct to such complaints. (*Id.*).

As explained in Section III.C herein, there are disputes of material facts as to Defendant's retaliatory conduct in its alleged disparate treatment and termination of Plaintiff. Such retaliatory conduct could demonstrate Defendant's "malice" or "reckless indifference" of Plaintiff's federally protected rights. Further, Defendant was aware of Plaintiff's 2,100 grievances detailing complaints of discrimination and retaliation, which supports an inference that Defendant acted in the "face of a perceived risk that its actions [would] violate federal law to be liable in punitive damages." (*See* Doc. 23, ¶¶ 10, 16–19, 24; Doc. 24-1, ¶¶ 15–18; Doc. 24-2, ¶¶ 20–23; Doc. 34-4, 23:24–26:4); *Kolstad*, 527 U.S. at 536.

As such, Plaintiff presents sufficient evidence for a reasonable jury to find that Defendant acted with malice or reckless indifference to Plaintiff's federally protected rights. Summary judgment is denied as to punitive damages.

## IV.   CONCLUSION

For the aforementioned reasons, Defendant's Motion for Summary Judgment (Doc. 25) is **GRANTED IN PART AND DENIED IN PART** as follows:

1.   Summary judgment is **GRANTED** as to Counts I, II, and V.

2.   Summary judgment is **DENIED** as to Counts III, IV, VI, including with regard to respective punitive damages.

**DONE AND ORDERED** in Orlando, Florida on March 15, 2024.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties